# EXHIBIT 1

# PREFERRED INVESTOR AGREEMENT

This Preferred Investor Agreement (the "Agreement") effective as of February 19, 2016 (the "Effective Date"), is by and between **PLAZA HOME MORTGAGE, INC.** ("Preferred Investor") and **BEST PARTNERS MORTGAGE COOPERATIVE, INC.** ("Lenders One"). Preferred Investor and Lenders One may be referred to herein together as the "Parties" and individually as a "Party".

**WHEREAS**, Lenders One is a national alliance of mortgage originators, directed to make available mortgage related products and services on a cooperative basis to its members (the "Members");

**WHEREAS**, Preferred Investor provides secondary market mortgage services (the "Services"), including, but not limited to, the purchase and sale of mortgage loans in the secondary mortgage market and desires to provide the Services to the Members; and

**WHEREAS**, Lenders One and Preferred Investor desire to enter into an agreement whereby Preferred Investor pays Lenders One a Production Marketing Fee for certain loans purchased from the Members by Preferred Investor, pursuant to the terms and conditions of this Agreement.

**NOW THEREFORE**, in consideration of these mutual promises, covenants, and agreements made and contained herein, and intending to be legally bound hereby, the Parties agree as follows:

1. **TERM; RENEWAL.** This Agreement shall commence on the Effective Date and shall terminate three (3) years thereafter (the "Initial Term"). This Agreement shall renew automatically for additional successive terms of one (1) year (each a "Renewal Term") unless at least sixty (60) calendar days prior to the end of the Initial Term or any Renewal Term, one Party notifies the other Party in writing of its intent to terminate this Agreement. The Initial Term and any Renewal Term are referred to as the "Term".

2. **TERMINATION**

    2.1 TERMINATION FOR CAUSE. Notwithstanding the foregoing, this Agreement may be terminated by either Party: (i) upon thirty (30) calendar days prior written notice of default and demand for cure if the other Party materially breaches this Agreement and fails to cure such breach within such notice period; (ii) immediately upon written notice, if the other Party: (a) commences a proceeding to invoke any laws relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts, (b) consents to or fails to contest in a timely and appropriate manner the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of such Party or a substantial portion of its assets, (c) makes a general assignment for the benefit of creditors, or (d) is unable to, or admits in writing its inability to, pay its debts as they become due; or (iii) upon providing the other Party thirty (30) calendar days prior written during the thirteenth calendar month after the Effective Date if the average Total Balance (defined below) during the first year of the Initial Term is equal to or less than $40,000,000.

    2.2 COMPLIANCE WITH LAWS AND REGULATIONS. If in the sole opinion of Lenders One any services provided pursuant to this Agreement are or are likely to violate any applicable law, regulation, ruling, consent decree, or binding opinion of a federal or state regulatory authority with jurisdiction over Lenders One (including any new or revised guidance or interpretation thereof), Lenders One may terminate this Agreement upon written notice to Preferred Investor.

3. **PRODUCTION MARKETING FEE; PAYMENT**

(a) Preferred Investor will pay Lenders One a monthly production marketing fee for all products (the "Production Marketing Fee") as follows:

   (i) <u>Best Efforts commitment Production Marketing Fee</u>: Preferred Investor will pay Lenders One five (5) basis points of, or 0.0005 times, the unpaid principal balance at the time of purchase per each and every loan purchased by Preferred Investor from Members pursuant to any best efforts commitment or delivery method. "Best Efforts" shall be deemed to refer to any mortgage loan sales agreement in which a seller commits to deliver an individual mortgage loan of a specified principal amount and quality to an investor, where the seller makes its best effort to deliver the loan to the investor prior to the commitment expiration date and failure to deliver the loan may or may not result in a pair-off fee.

   (ii) <u>Mandatory commitment Production Marketing Fee</u>: Preferred Investor will pay Lenders One the product of the Mandatory Basis Points and the unpaid principal balance at the time of purchase per each and every loan purchased by Preferred Investor from Members pursuant to a Mandatory delivery method or commitment.

   a. "Mandatory Basis Points" means basis points in Table 1 that correspond to the Total Balance. By way of example, three (3) Mandatory Basis Points would apply with a Total Balance of $50,000,000.

   b. "Total Balance" means total unpaid principal balance of all loans purchased by Preferred Investor from Members (both Best Efforts and Mandatory delivery methods or commitments) during the applicable calendar month.

   c. "Mandatory" delivery method or commitment shall be deemed to refer to any mortgage loan sales agreement in which a seller commits to deliver a certain principal amount of mortgage loans to an investor at a specified price on or before a specified date.

| Table 1 | |
|---|---|
| Total Balance | Mandatory Basis Points |
| $1 - $40,000,000.00 | 2 |
| $40,000,000.01 - $80,000,000 | 3 |
| $80,000,000.01 - $120,000,000 | 4 |
| $120,000,000+ | 5 |

Example: In a calendar month Preferred Investor purchases loans from Members with unpaid principal balances of $130,000,000; $30,000,000 through Mandatory delivery or commitment and $100,000,000 through Best Efforts. The Production Marketing Fee will equal $65,000 [(.0005 * 100,000,000) + (.0005 * 30,000,000)].

(b) Lenders One shall provide an electronic mail address to which invoices may be submitted. Preferred Investor will pay Lenders One directly the Production Marketing Fee within twenty-five (25) days from the end of the month immediately following the month in which the loans were sold by Members to Preferred Investor, via automated clearing house or similar electronic transfer, unless otherwise indicated by Lenders One, in accordance with the payment instructions set forth in **Exhibit A** (Payment Instructions).

(c) The expiration or termination of this Agreement for any reason, other than termination by Preferred Investor as a non-breaching Party pursuant to a breach termination, shall not discharge Preferred

Investor from its responsibility to pay Lenders One the Production Marketing Fee for a period one (1) year from and after the effective date of such expiration or termination.

4. **LATE PAYMENT.** Any amounts invoiced and not paid when due shall bear interest at the lower of two percent (2%) per month or the maximum rate allowed by law. Preferred Investor also shall pay Lenders One all expenses incurred by Lenders One in exercising any of its rights under this Agreement or applicable law with respect to a payment default by Preferred Investor including but not limited to reasonable attorneys' fees, costs for pursuing legal remedies, and the fees of any collection agency retained by Lenders One, within thirty (30) calendar days of its receipt of a written request from Lenders One.

5. **EARLY PAYMENT DEFAULT; EARLY PAY-OFF; PRE-PAYMENT PENALTY.** Preferred Investor will offer Members its most favorable commercially offered terms on early payment default, early pay-off and loan repurchase obligations, consistent with those offered by Preferred Investor to similarly situated sellers.

6. **RATE SHEET.** Preferred Investor may provide Members with different rate sheets, according to each Member's individual business profile, provided however, that such rate sheets shall be comparable to those rate sheets Preferred Investor offers to its other similarly situated customers that are not Members. Preferred Investor further agrees that, it shall not offer any Member a rate sheet with less attractive pricing solely as a result of its status as a Member. This is specifically applicable as well, in connection with any other rate sheets offered by Preferred Investor to any Member which was a customer of the Preferred Investor prior to joining Lenders One, in comparison to the rate sheets such Member was offered by Preferred Investor previous to joining Lenders One.

7. **INVESTOR FEES.** Preferred Investor will offer Members investor fees comparable to those offered to its other similarly situated sellers. If Preferred Investor offers lower investor fees to its customers, it will offer the same or better investor fees to Members similarly situated as other customers obtaining same lowered or bettered fee. Preferred Investor further agrees that, it shall not offer any Member a rate sheet with less attractive pricing solely as a result of its status as a Member. This is specifically applicable as well, in connection with any other investor fees offered by Preferred Investor to any Member that was previously a Preferred Investor customer prior to joining Lenders One, in comparison to the rate sheets such Member was offered by Preferred Investor previous to joining Lenders One.

8. **MEMBERS.** Subject to the terms of the confidentiality provisions provided below in this Agreement, during the Term, Lenders One shall supply Preferred Investor with a listing of all current Members and shall periodically update the same so as to ensure that Preferred Investor is provided current Member information. Preferred Investor and any of the Members may agree upon incentive fee arrangements, and such Members will benefit from those incentives, in addition to and independently from any other incentive provided by Lenders One, provided, however that Lenders One will earn the Production Marketing Fee on loans purchased by Preferred Investor from Members regardless of whether any other incentive payment is being paid on the same loans by Preferred Investor. Lenders One shall begin earning and receiving the Production Marketing Fee on loans that are committed by Members and purchased by Preferred Investor from such Members on and after the Effective Date. In connection with Members that apply and are newly approved by Preferred Investor, Lenders One will begin to earn the Production Marketing Fee on loans committed by such Members and purchased by Preferred Investor, on and after the date these Members are approved by Preferred Investor. If a Member's membership with Lenders One is terminated, Preferred Investor agrees to pay the

corresponding Production Marketing Fee on all loans that are accepted by or committed to Preferred Investor while the correspondent is a Member and purchased by Preferred Investor for up to ninety (90) days after the membership is terminated. If Preferred Investor terminates a Member and later reinstates such Member, Preferred Investor will pay Lenders One the corresponding Production Marketing Fee on all loans purchased by Preferred Investor in accordance with the terms provided for herein so long as the reinstated Member is a Member at the time of the reinstatement by Preferred Investor. Preferred Investor understands and agrees that Lenders One makes no representation that the Members will enter into any agreements with Preferred Investor or deliver any volume of mortgage loans to Preferred Investor, and that Lenders One has no responsibility for the acts or omissions of any of the Members. Preferred Investor is solely responsible for billing and collecting any payments due from the Members to Preferred Investor directly from the Members. Preferred Investor further acknowledges and agrees that this Agreement is not intended to enable or authorize Preferred Investor to be an exclusive provider of any type of services or products to Lenders One or the Members.

9. **MEMBER APPLICATION, DISCOUNTS AND OTHER SERVICES.**
(a) All Members that are not currently approved correspondents with Preferred Investor at the time of execution of this Agreement may provide Preferred Investor with an application for approval in the manner required or approved by Preferred Investor (which application may, at the sole discretion of Preferred Investor, include a Lenders One Member Application). Preferred Investor may, at its sole discretion and at its own risk, choose to utilize the Lenders One Member Application to approve new clients, for the purposes of this Agreement. Preferred Investor shall expedite the approval process of all applications submitted by Members.
(b) For each Member, Preferred Investor shall reduce the (i) standard administration fee Plaza charges in the event of a repurchase demand from $10,000 to $5,000 (excludes a reduction to any other amounts associated with a repurchase demand) and (ii) the administration fee from $295 to $150, provided the Member already participating in the CastleLine™ proprietary certification process.
(c) For all loans purchased by Preferred Investor from Members who are not currently approved correspondents of Preferred Investor, Preferred Investor shall (i) engage Altisource Solutions S.à r.l. to perform the CastleLine™ proprietary certification process unless CastleLine™ is unable to perform the certification process on such loans, or the Parties have mutually agreed that CastleLine™ will not perform the certification process on such loans and (ii) purchase Certified Loan Insurance covering such loans from the Association of Certified Mortgage Originators Risk Retention Group, Inc.

10. **RIGHT TO MARKET; ADVERTISING; PROMOTIONAL MATERIALS.** Except as provided in this Section, neither Party may use the other Party's names, trademarks, servicemarks or logos without such Party's prior written consent, in each instance. Notwithstanding the foregoing, Preferred Investor hereby authorizes Lenders One to use Preferred Investor's contact information and approved logo for marketing and advertising purposes, such as but not limited to websites, marketing materials, directories, lists or discussions, as it relates to the promotion of Preferred Investor as a Lenders One preferred investor to the Member. For such purposes, Preferred Investor acknowledges and agrees that Preferred Investor shall timely provide to Lenders One, upon request, Preferred Investor's logo and other information, and in the event that any of such logo and/or information changes, Preferred Investor shall promptly provide to Lenders One the updated logo and/or information. For the avoidance of doubt, the Parties acknowledge and agree that each Party's names, trademarks, servicemarks or logos shall at all times be and remain the sole and exclusive property of such Party.

11. **REPORTING.** During the Term, and for a period of twelve (12) months thereafter, Preferred Investor shall submit to Lenders One a monthly mortgage purchase report of all loans

purchased by Preferred Investor from Members during the previous month, to the extent related to payment to Lenders One of the Production Marketing Fee, within fifteen (15) days from the end of each month following the acceptances and/or purchases (unless such day is a weekend or a holiday, in which case reports will be submitted on the first business day thereafter), in the format attached hereto as **Exhibit B** (Monthly Report Format). Preferred Investor shall provide the reports via electronic mail to CooperativeReporting@altisource.com, unless Lenders One requests Preferred Investor to send the reports to other electronic mail address or through other means. The reports provided under this Section shall be subject to Lenders One's review and approval and Lenders One may: (i) object the information therein; (ii) engage in discussions with Preferred Investor in connection with such information; and/or (iii) request evidence supporting such information, to Lenders One's satisfaction, to accept such reports as valid. Preferred Investor further agrees to cooperate with Lenders One to clarify any inconsistencies in the information provided pursuant to this Section and to use good faith efforts to reconcile any dispute between the Parties in connection with such information.

12. **AUDIT RIGHTS.** During the Term, and for a period of eighteen (18) months thereafter, Lenders One may perform an audit of the applicable Preferred Investor's records directly related to the sale and purchase of loans from Members and the payment of the Production Marketing Fee and other fees set forth hereunder in order to verify Preferred Investor's compliance with the terms of the Agreement, and the accuracy of Preferred Investor's payments hereunder. Any audit conducted pursuant to this Section shall be limited to once (1) annually, shall be performed during normal business hours and shall require not less than fourteen (14) calendar days prior written notice to Preferred Investor. Lenders One shall be responsible for the cost of such audit unless such audit reveals that Preferred Investor has underpaid any amounts due under this Agreement by more than $25,000 or that Preferred Investor has failed to comply with the terms in this Agreement, in which case Preferred Investor shall reimburse, within thirty (30) calendar days of a written request from Lenders One all of Lenders One's costs and expenses, including court costs and accountants' and attorneys' fees, in addition to any deficiencies in the amount paid to Lenders One discovered in the audit performed.

13. **OTHER COOPERATIVES.** Lenders One acknowledges that, during the Term, Preferred Investor may have the opportunity to work with other mortgage cooperatives or mortgage alliances ("Alliances"). Should Preferred Investor offer terms, pricing or any other incentive to another Alliance that are more favorable to the fee pricing or terms offered to Lenders One pursuant to this Agreement, Preferred Investor must simultaneously offer equivalent terms to Lenders One in writing. This Section shall not apply to any other cooperative or alliance managed by Lenders One's management company, The Mortgage Partnership of America, LLC ("MPA"), directly or indirectly through its Affiliates (as herein defined).

14. **REPRESENTATIONS AND WARRANTIES AND COVENANTS.** Each of the Parties to this Agreement represent and warrant that: (i) it is a business entity duly organized and validly existing and in good standing under the laws of the jurisdiction of its formation or incorporation, respectively, with full corporate power, authority and legal right to execute, deliver and perform its obligations under this Agreement; (ii) this Agreement has been duly authorized, executed and delivered and is a legal, binding obligation of each Party, enforceable in accordance with its terms; (iii) except as disclosed to the other Party in writing, there are no actions, suits or proceedings pending or threatened that, if determined adversely to the Party, would have a material adverse effect on the financial condition or operation of such Party; (iv) each Party shall perform its activities hereunder in a professional manner; and (v) each Party shall strictly comply in all material respects with all applicable U.S. and foreign laws, statutes, ordinances, rules, regulations and orders, in effect or hereafter established, without limitation, as such relate to its performance and obligations pursuant to this

Agreement. Preferred Investor further represents and warrants that it has all right, title and interest in and to the Services, logos, marketing materials and other associated Preferred Investor's materials provided to Lenders One, and has all requisite licenses, power and authority to deliver the Services to the Members.

### 15. CONFIDENTIALITY

15.1 DEFINITION. Confidential Information shall mean:

(i) WITH RESPECT TO LENDERS ONE: Any information related to Lenders One and the Members, including but not limited to the identity of the Members, Lenders One Member list and Member information, including costs and expenses of the Members, Lenders One's preferred lenders and preferred vendors, customer and supplier lists, and any other information relating to or concerning Lenders One, its management company, MPA, or its Affiliates, disclosed to Preferred Investor in connection with this Agreement, including but not limited to trade secrets, organizational documents, know how, inventions, techniques, processes, programs, schematics, software source documents, data, pricing and discount schedules, financial information, sales and marketing plans.

(ii) WITH RESPECT TO PREFERRED INVESTOR: Preferred Investor's customer list and customer information, pricing and marketing information related to the Services and disclosed to Lenders One in connection with this Agreement, provided however that, any such information is provided in writing and prominently marked as "Confidential," or under the circumstances of the disclosure, a reasonably party would deem the information to be confidential. The foregoing information shall not be considered Confidential Information when Lenders One uses or discloses the Confidential Information in its provision as contemplated under this Agreement. Preferred Investor's Confidential Information shall also include the information provided to Lenders One pursuant to Section 11 (Reporting) and the information discovered by Lenders One during any audit conducted pursuant to Section 12 (Audit Rights) of this Agreement; and

(iii) WITH RESPECT TO BOTH PARTIES: the terms and conditions of this Agreement, including but not limited to, the Production Marketing Fee.

15.2 EXCLUSIONS. Notwithstanding the foregoing, Confidential Information shall not include information which (i) is previously known to Recipient (as defined below) free of any obligation to keep it confidential; (ii) is or becomes publicly available, other than through disclosure by Recipient in violation of this Agreement; (iii) is independently developed by Recipient, as evidenced by written records prepared by Recipient prior to the Effective Date and without violating any of its obligations under this Agreement; and (iv) is authorized by Discloser in writing to be publicly disclosed without restriction.

15.3 NON-DISCLOSURE. The Party receiving Confidential Information under this Agreement ("Recipient") shall (i) treat such Confidential Information with the same degree of care (provided that such degree of care is at least a reasonable degree of care) as it would use to protect its own confidential information and to avoid disclosure to third parties and (ii) use the Confidential Information only for the purpose of fulfilling its obligations under this Agreement, unless otherwise agreed to in writing by the Party disclosing the Confidential Information ("Discloser"). In the event of a dispute, the burden will be on Recipient to demonstrate that the standard of care described herein was used. Recipient shall not disclose any Confidential Information to any person or entity without Discloser's prior written consent, other than to their own employees, agents, contractors or consultants (collectively, "Representatives") as may be reasonably necessary for purposes of performing their duties hereunder, and after such Representatives have been informed and who have agreed to be bound by the terms of this Section 15. Recipient shall be responsible for any breach of this Agreement by its Representatives. With respect to any intellectual property disclosed hereunder, Recipient shall not decompile or disassemble any of Discloser's intellectual property, or in any way reverse engineer or attempt to reconstruct or discover any source code or algorithms of such intellectual property by any means whatsoever, or modify or

create derivative works or improvements based upon such intellectual property or any portion thereof, duplicate or otherwise reproduce Discloser's intellectual property, except for archival purposes or as necessary to allow its personnel to use such intellectual property pursuant to this Agreement.

15.4 LEGALLY REQUIRED DISCLOSURE. Recipient may disclose such Confidential Information to the extent required by any request or order of any government authority, provided that it shall, to the extent permitted by law, first notify Discloser such requirement and permit and cooperate with Discloser in contesting such requirement before it discloses any Confidential Information. Recipient agrees, to the extent permitted by law, to promptly notify Discloser in writing upon receipt of such request or order.

15.5 REMEDIES. In the event that Recipient otherwise discloses any Confidential Information in violation of this Agreement, Discloser shall be entitled to seek injunctive relief against such action, breach or alleged breach in any court of competent jurisdiction, without the posting of any bond therefor. Such injunctive relief will in no way limit Discloser's right to obtain other remedies available under applicable law. No failure or delay by Discloser in enforcing any right, power, or privilege created hereunder shall operate as an implied waiver thereof, nor shall any single or partial enforcement thereof preclude any other or further enforcement thereof or the enforcement of any other right, power, or privilege. In addition, Discloser shall be entitled to recover from Recipient all reasonable attorneys' fees and costs incurred as a result of a breach of this Section.

15.6 RETURN OF CONFIDENTIAL INFORMATION. Upon expiration or termination of this Agreement, Recipient will promptly destroy all Confidential Information in its possession and certify to Discloser that all such Confidential Information of Discloser (including all copies thereof and all notes, extracts or summaries based thereon) has been destroyed, or, if directed by Discloser, return all Confidential Information to Recipient. The foregoing notwithstanding, Recipient shall be permitted to retain such copies of Confidential Information as necessary for legal or recordkeeping purposes, including such copies as are embedded in the automated backup of electronic data processing systems. Any Confidential Information so retained shall remain subject to the provisions of this Section.

15.7 SURVIVAL. The obligations set forth in this Section will survive for three (3) years from the termination or expiration of this Agreement. Notwithstanding the preceding, the three (3) year period shall not apply to trade secrets and instead the confidentiality period for trade secrets shall remain in effect for so long as the Confidential Information qualifies as a trade secret.

**16. LIMITATION OF LIABILITY.** EXCEPT WITH RESPECT TO A BREACH OF SECTION 14 (REPRESENTATIONS AND WARRANTIES AND COVENANTS) AND OF SECTION 15 (CONFIDENTIALITY) OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY, ITS AFFILIATES OR THEIR RESPECTUVE RESPECTIVE CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES, AGENTS, SUCCESSORS, AND ASSIGNS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, DELAY, DISRUPTION, LOSS OF PRODUCT, LOSS OF ANTICIPATED PROFITS OR REVENUE, LOSS OF USE OF EQUIPMENT OR SYSTEMS, NON-OPERATION OR INCREASED EXPENSE OF OPERATION OF OTHER EQUIPMENT OR SYSTEMS, COST OF CAPITAL, OR COST OF PURCHASE OR REPLACEMENT EQUIPMENT, SYSTEMS OR SERVICES, EXEMPLARY OR PUNITIVE DAMAGES BASED ON ANY THEORY OF CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE, WARRANTY, STATUTE OR ANY OTHER LEGAL OR EQUITABLE THEORY OR PRINCIPLE OR OTHERWISE, ARISING OUT OF OR IN ANY MANNER CONNECTED WITH THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, AND REGARDLESS OF WHETHER THE PARTY HAS BEEN INFORMED OF, OR OTHERWISE MIGHT HAVE ANTICIPATED, THE POSSIBILITY OF SUCH DAMAGES.

## 17. INDEMNIFICATION.

17.1 Preferred Investor shall indemnify and hold harmless Lenders One, its Affiliates and their respective current and former directors, managers, officers, employees, agents, successors, and assigns (any such person seeking indemnification, singular or collectively, the "Lenders One Parties") from and against any and all loss, liability, cost and expense, court costs and reasonable attorneys' fees, claims, demands, suits or proceedings (collectively "Claims", and in the singular "Claim"), that any of the Lenders One Parties suffer or incur arising from or related to: (i) the Preferred Investor's breach of this Agreement; (ii) claims of infringement of any third party rights in connection with: (a) the authorized use hereunder of Preferred Investor's intellectual property, or (b) in connection with the authorized use hereunder of that Preferred Investor's name, logo or other marks; (iii) Preferred Investor's gross negligence, fraud or intentional misconduct.

17.2 Lenders One shall indemnify, defend and hold harmless Preferred Investor from and against third party Claims to the extent arising from Lenders One's (i) Lenders One's breach of this Agreement; (ii) claims of infringement of any third party rights in connection with (a) the authorized use hereunder of Lenders One's intellectual property, or (b) in connection with the authorized use hereunder of Lenders One's name, logo or other marks and (iii) Lenders One's gross negligence, fraud or intentional misconduct.

17.3 The indemnified Party will provide the other Party: (i) reasonably prompt written notice of any Claims; (ii) control over the defense or settlement of any such Claims, provided that indemnifying Party may not settle such Claims or admit liability on the part of the indemnified Party without the indemnified Party's prior written consent, which consent will not be unreasonably withheld and provided that the indemnified Party has the right to participate in the defense of such Claims at the indemnified Party's expense and through counsel of the indemnified Party's choosing; and (iii) non-financial assistance at the indemnifying Party's request to the extent reasonably necessary for the defense of any such Claims. However, if the indemnifying Party fails to defend the Claims, the indemnified Party may, at its option, conduct the defense of any Claims arising under this section, and the indemnifying Party agrees to cooperate in such defense, provided the indemnified Party reasonably consults with indemnifying Party on any related settlement. A failure by an indemnified Party to provide reasonably prompt written notice of the existence of any Claims will only affect the indemnifying Party's obligation to pay costs to the extent such failure materially prejudices indemnifying Party's ability to reduce costs or defend such Claims.

## 18. RELATIONSHIP OF THE PARTIES.

The Parties agree and acknowledge that the relationship of the Parties is in the nature of independent contractors and nothing contained herein shall be construed to create any association, employment relationship, partnership, franchise, agency relationship or joint venture between the Parties, and neither Party is the other's employee, partner, franchisee, agent, or representative, nor shall either Party have the power to obligate or bind the other, in any manner whatsoever, without the prior written consent of the Party to be bound or obligated. Preferred Investor acknowledges and agrees that this Agreement is non-exclusive with Preferred Investor and that Lenders One may, in its sole discretion, enter into similar arrangements with any third party.

## 19. COMPENSATION UPON EXPIRATION OR TERMINATION.

If this Agreement expires or is terminated by any of the Parties, Preferred Investor shall pay Lenders One the Production Marketing Fee up to and including the effective date of the termination/expiration of this Agreement, to the extent not previously paid to Lenders One, pursuant to Section 3 (Production Marketing Fee; Payment). For the avoidance of doubt, Preferred Investor shall pay Lenders One the Production Marketing Fee for all loans locked and subsequently purchased by Preferred Investor up to and through the effective date of the earlier of expiration or termination, even if the actual purchase date extends

beyond the termination or expiration of this Agreement. For purposes of this Section, a loan is considered "locked" when Preferred Investor has issued a price commitment on a loan or loans originated by a Member. In addition to the foregoing, Preferred Investor shall pay the Production Marketing Fee for a period of one (1) year after such termination or expiration, pursuant to Section 3(c).

**20. ENTIRE AGREEMENT; AMENDMENTS.** This Agreement embodies the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all other and prior agreements and understandings, oral or written, and collateral representations, promises and conditions relating to the subject matter hereof. Any representation, promise or condition not incorporated in this Agreement shall not be binding on either Party. This Agreement may not be amended except in a writing signed by a duly authorized representative of both Parties.

**21. GOVERNING LAW; JURISDICTION; VENUE; WAIVER OF JURY TRIAL.** The validity, meaning and effect of this Agreement and the respective rights and obligations of the Parties shall be governed by, construed by, and enforced in accordance with the laws of the State of New York without regard to conflicts of laws rules or principles. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE ANY RIGHT WHICH EITHER OR BOTH OF THEM MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL CLAIMS, CONTROVERSIES OR DISPUTES WHICH MAY ARISE OUT OF OR RELATE TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF.

**22. ATTORNEY FEES.** In the event of any dispute with respect to or relating to this Agreement in any way, the prevailing Party shall be entitled to reasonable legal fees and other costs and expenses incurred in resolving such dispute, in addition to any other relief to which that Party may be entitled.

**23. SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Neither Party shall assign or transfer, in whole or part, any of its rights or obligations under this Agreement, whether by agreement, operation of law or otherwise, without the prior written consent of the other Party. Any purported assignment in violation of the preceding sentence shall be null and void. A change of control of a Party, whether by sale, merger, conversion, or otherwise, shall not be deemed an assignment. Notwithstanding the foregoing, Lenders One in its sole discretion has the right to assign this Agreement or any respective rights and duties thereto, in whole or in part, to MPA or any of its Affiliates without Preferred Investor's consent. Lenders One shall notify Preferred Investor of any such assignment. For purposes of this Agreement, "Affiliate" shall mean any entity that controls, is controlled by, or is under common control with a Party, and "control" means possessing, directly or indirectly, the power to direct or cause the direction of the management, policies or operations of an entity, whether through ownership of voting securities, by contract or otherwise. Nothing in this Agreement, express or implied, is intended to confer any rights, obligations, remedies or liabilities of any nature whatsoever on any person other than the Parties and their successors and permitted assigns as described herein.

**24. NON-WAIVER. SEVERABILITY.** Neither Party shall be deemed to have waived any right, power or privilege under this Agreement unless such waiver shall have been expressed in writing signed by the waiving Party. No delay in enforcing or failure to complain or enforce any provision of this Agreement by either Party shall in any way be construed as a waiver of such provision or a waiver of the rights of such Party to thereafter enforce such provision or any other provision of this Agreement. No waiver of any of the provisions of this Agreement shall be deemed to be a waiver of other provisions of this Agreement, and a waiver at any time of any breach or default of this Agreement shall not

constitute a waiver at any subsequent time of any breach or default or a waiver of the provision itself. If any provision of this Agreement, or the application of such provision to any Party or circumstance, is held to be invalid, illegal or unenforceable for any reason, such provision shall be deemed modified in scope or application to the extent necessary to render the same valid and to reflect as nearly as possible the intent of the Parties upon entering into this Agreement or shall be excised from this Agreement as the situation may require, and this Agreement shall be construed and enforced as if such provision had been excluded. In any event, the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the Parties hereto.

25. **CUMULATIVE REMEDIES.** The rights and remedies of the Parties hereunder, or in law or in equity, shall not be mutually exclusive and are and shall be cumulative and may be exercised separately or concurrently and from time to time without waiver of any other remedies.

26. **NOTICES.** Unless otherwise specified in this Agreement, all notices, requests, demands, and other communications (other than routine operational or billing communications, as directed in those communications) required or permitted hereunder shall be in writing (with electronic mail deemed to be a "writing" for the purpose of this Section) and shall be deemed given: (i) upon receipt, if hand delivered personally, against a signed receipt, or if mailed by registered or certified mail, return receipt requested and postage prepaid; or (ii) at noon on the second (2nd) business day after dispatch if sent by a nationally recognized, reputable overnight courier with a reliable system for tracking delivery; and (iii) if such notice is to Lenders One, when (i) or (ii) has occurred and a copy is sent and received by electronic mail to: contractmanagement@altisource.com. Notices shall be delivered to the following address and electronic mail address if to Lenders One (or at such other address a Party may specify by like notice):

If to Lenders One:
Best Partners Mortgage Cooperative, Inc.
Two City Place, Suite 30
St. Louis, Missouri 63141
Attention: Law Department
With a copy to: contractmanagement@altisource

If to Preferred Investor:
Plaza Home Mortgage, Inc.
4820 Eastgate Mall, Suite 100
San Diego, CA 92121
Attention: Salpi Meyer

27. **FORCE MAJEURE.** Except for the obligation to pay the Production Marketing Fee and/or other fees when due and payable and provide Members the benefits under Section 9, no failure or omission to carry out or to observe any of the terms, provisions or conditions of this Agreement by either Party shall give rise to any claim by either Party against the other or be deemed to be a breach of this Agreement by either Party provided that such failure or omission is due to any event, matter or thing beyond the reasonable control of such Party, including natural calamities or phenomena, such as, and without limitation, earthquakes, hurricanes, typhoons, floods, fires, plague, Acts of God, or other natural disasters, or political and special events, such as, and without limitation, wars declared or not, hostilities, invasions, riots, civil disturbances, strikes, acts of terrorism, nuclear or chemical contamination, failure of public infrastructure, utility or internet service provider failures and any other reasonably recognized or declared federal or state disasters or "force majeure" reasons. If any circumstances described above occur which are beyond the control of the Parties, which delay or render impossible, for a period of time, the performance of the obligations of one or both of the Parties under this Agreement, the Party's obligation to perform such obligations shall be postponed for an equivalent period of time or shall be cancelled, if such performance has been rendered impossible by such circumstances.

28. **CONFERENCES, CONVENTIONS AND SPONSORED EVENTS.** Preferred Investor may participate in all of the Lenders One's membership conferences and in other conventions or other sponsored events to which Preferred Investor is invited so long as it is economically reasonable for Preferred Investor to do so. Although Preferred Investor will be entitled to attend with up to four (4) employees each of the conferences, conventions or other sponsored events, participation shall mean the attendance of at least one (1) Preferred Investor employee and payment of the current exhibitor fee. Preferred Investor may, in its sole determination, elect to pay a conference sponsorship fee based on available sponsorship options at each conference to improve Preferred Investor's placement and marketing position at such conferences. For each conference attended, Preferred Investor shall pay all of its own costs and expenses (and those of its employees) incurred in attending each such conference, including but not limited to airfare and accommodations.

29. **SURVIVAL.** The expiration or termination of this Agreement by either Party for any reason shall not discharge Preferred Investor from its obligations set forth in Section 3 (Production Marketing Fee; Payment); Section 4 (Late Payment) Section 11 (Reporting); Section 12 (Audit Rights); Section 15 (Confidentiality); Section 16 (Limitation of Liability); Section 17 (Indemnification); Section 19 (Compensation Upon Expiration or Termination) and Section 22 (Attorneys' Fees).

30. **INTERPRETATION.** Unless the context of this Agreement clearly requires otherwise: (i) references in this Agreement to the plural include the singular, the singular the plural, the masculine the feminine, the feminine the masculine and the part the whole; and (ii) the word "or" shall not be construed as exclusive and the words "including", "includes", and "included" shall not be construed as limiting. The enumeration and headings contained in this Agreement are inserted for reference purposes only and shall in no way govern or affect the interpretation thereof. This Agreement shall be construed fairly as to both Parties, and the rule of construction that the Agreement shall be interpreted against the Party responsible for the drafting or preparation of such shall neither apply nor grant favor of or against either Party, regardless of which Party prepared the Agreement.

31. **COUNTERPARTS AND ELECTRONIC SIGNATURES.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which shall together constitute one and the same agreement. Counterparts shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterpart. This Agreement and its counterparts may be executed by providing an electronic signature under the terms of the Electronic Signatures Act, 15 U.S.C. § 7001 et. seq., and may not be denied legal effect solely because it is in electronic form or permits the completion of the business transaction referenced herein electronically instead of in person.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement on the date first above written.

| PREFERRED INVESTOR<br>Plaza Home Mortgage, Inc. | LENDERS ONE<br>Best Partners Mortgage Cooperative, Inc. |
|---|---|
| Signature: _[signature]_ | Signature: _[DocuSigned: 04C08672EBFF4FE...]_ |
| Name (Print): Michael Fontaine | Name (Print): Daniel Goldman |
| Title: EVP, Chief Financial Officer | Title: VP - National Sales |
| Date: 2/25/16 | Date: February 26, 2016 \| 10:41 AM PT |

# EXHIBIT A

# PAYMENT INSTRUCTIONS

*Electronic Payments:*

Bank: Wells Fargo Bank NA

Account Name: The Mortgage Partnership of America, LLC

Account Number: ▮▮▮▮▮▮▮▮

ABA: ▮▮▮▮▮▮▮▮

*Checks:*

Please mail to the following address:

To: The Mortgage Partnership of America, LLC

Attention: Accounting Specialist

Address: 2 Cityplace Drive, Suite 30; St. Louis, MO 63141

*Checks needs to be made out in the name of The Mortgage Partnership of America, LLC

*If applicable, please attach a copy of the monthly report or include reference to the related monthly report

**Preferred Investor Agreement**
**Exhibit A**
**(T-0720-16)**